Edna Faye JOHNSON (Widow of Homer
B. Johnson), Petitioner,

v.

PEABODY COAL COMPANY; Old Re-
public Companies; Director, Office of
Workers' Compensation Programs, Unit-
ed States Department of Labor, Respon-
dents.

No. 93–3439.

United States Court of Appeals,
Sixth Circuit.

Argued April 19, 1994.

Decided June 1, 1994.

Elizabeth A. Corcoran (argued and
briefed), Barkan & Neff, Columbus, OH, for
petitioner.

Bradley Keith Sinnott (argued and
briefed), Vorys, Sater, Seymour & Pease,
Columbus, OH, Dorothy Page (argued), Ei-
leen McCarthy (briefed), U.S. Dept. of La-
bor, Office of Sol., Washington, DC, for re-
spondents.

Before: MILBURN and GUY, Circuit
Judges, and BROWN, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Petitioner, Edna Johnson, appeals from a
denial of her claim for survivor's benefits
under the Black Lung Benefits Act, 30
U.S.C. §§ 901–945 (1988). Petitioner is the
widow of Homer Johnson, who died on May
21, 1989, as a result of a self-inflicted gunshot
wound. At the time of his death, Homer
Johnson suffered from a variety of illnesses,
including pneumoconiosis. Petitioner's claim
for benefits is predicated upon the theory
that her husband was severely depressed at
the time he committed suicide and that this
depression was caused by his illnesses, in-
cluding pneumoconiosis.

The issue presented upon appeal is a nar-
row one: whether a miner who commits sui-
cide under this fact situation died "due to
pneumoconiosis" within the meaning of the
Black Lung Benefits Act and regulations.[1]
The Benefits Review Board (Board) conclud-
ed that it was inappropriate to pay survivor's
benefits when the actual cause of death was
suicide. On appeal, the Director of the Of-
fice of Workers' Compensation Programs,
United States Department of Labor, urges a
contrary result. We agree with the Board
and affirm.

1. Because of our resolution of this issue, we have
not set forth an analysis of the issue of whether
the record made in this case would support an
award of benefits. However, our conclusion on
the latter issue would be that the record would
*not* support an award of benefits even if we were
to adopt the reasoning urged by the Department
of Labor.

## I.

There is no dispute that Homer Johnson had worked in the mines for 32 years. It is also undisputed that he suffered from a variety of respiratory ailments, including asthmatic bronchitis, chronic obstructive pulmonary disease (COPD), and pneumoconiosis. Being a two-pack-a-day smoker for 30 years, along with his mine work, contributed to Johnson's respiratory problems. Before his death in 1989, Johnson had filed two applications for benefits, which were finally denied on January 27, 1986. The basis for denial was a finding that his respiratory difficulties were due to his extensive history of cigarette smoking and not coal miner's pneumoconiosis. Johnson did not appeal this denial.

In the last months of his life, Johnson experienced great difficulty in breathing and became both anxious and depressed about his illnesses. On more than one occasion he had been hospitalized. Johnson's final hospitalization was from May 4, 1989, to May 16, 1989. Breathing difficulties and depression were noted. Johnson saw a psychiatrist and anti-depressant drugs were prescribed.

The final discharge summary notes that "Psychiatry felt he was improving and they could sign off." Johnson became "progressively less nervous and anxious" and was weaned off oxygen. On the day of his discharge, he was breathing easier, experienced no pain, and appeared to be less depressed. Five days later, however, Johnson committed suicide.

## II.

Since this claim was filed in 1989, its resolution is controlled by the Department of Labor's (DOL) regulations found at 20 C.F.R. Part 718. Pursuant to this regulation, a survivor must prove that the deceased miner's death was "due to pneumoconiosis." 30 U.S.C. § 922(a)(2); 20 C.F.R. § 725.-212(a)(3)(ii). For claims filed after January 1, 1982, death is considered due to pneumoconiosis only:

(1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or

(2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or

(3) Where the presumption set forth at § 718.304 is applicable.

(4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death.

20 C.F.R. § 718.205(c).

Petitioner concedes that, if she is to recover, she must prove that pneumoconiosis was a "substantially contributing cause of death." To that end, petitioner alleges a psychological connection between the miner's pneumoconiosis and his death.

There are no reported appellate decisions dealing with this issue of suicide. This does not mean it has not been raised before. There are a number of cases in which this issue has been dealt with administratively [2] and at least one unreported appellate court decision.[3]

In none of these cases were benefits ever awarded when suicide was the immediate cause of death. The DOL has historically

---

**2.** *See, e.g., Ray v. Mastellar Coal Co.,* 12 BLR 3-570 (1989); *Caudill v. Cheryl Coal Co.,* No. 88-BLA-794, 1990 BLA LEXIS 33 (1990); *O'Donnell v. Director, OWCP,* No. 89-BLA-00818, 1989 BLA LEXIS 4737 (1989); *Stevens v. Director, OWCP,* No. 86-BLA-3573, 1989 BLA LEXIS 3464 (1989); *Mayse v. Itmann Coal Co.,* No. 87-BLA-1261, 1989 BLA LEXIS 1489 (1989); *Tucker v. Bethlehem Mines Corp.,* No. 86-BLA-3877, 1988 BLA LEXIS 4535 (1988); *Wojcik v. Director, OWCP,* No. 86-BLA-1575, 1988 BLA LEXIS 3232 (1988); *Begansky v. Director, OWCP,* No. 87-BLA-1232, 1988 BLA LEXIS 1107 (1988); *Muse v. Director, OWCP,* No. 87-BLA-1718, 1987 BLA LEXIS 147 (1987). Although in some of these cases the Board entertained the claim despite the suicide, benefits were not awarded in any of them.

**3.** *Haduck v. Director, OWCP,* 14 BLR 1-29 (Available on WESTLAW FWC-BLB database) (1990), *petition for review denied,* 932 F.2d 959 (3d Cir. 1991).

supported the denial of benefits under these circumstances. In addressing the deference to be accorded when an agency changes its position, the Supreme Court reiterated in *Good Samaritan Hospital v. Shalala,* —— U.S. ——, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993): " '[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.'" *Id.* —— U.S. at ——, 113 S.Ct. at 2161 (citations omitted).

In support of the interpretation of the regulations now urged, the Director offers legislative history and an analogy to state workers' compensation laws. We first address statutory history.

Prior to 1981, a survivor of a miner who was totally disabled due to pneumoconiosis would automatically receive benefits at the miner's death, regardless of the cause of death.[4] The 1981 amendment to the Black Lung Act eliminated automatic entitlement and prohibited the award of benefits when a miner's death was unrelated to pneumoconiosis.

The legislative history, which the Director suggests is illuminating, stems from similar statements made by Senator Orrin Hatch and Representative Carl Perkins, who chaired the committees responsible for the amendments. Specifically, Representative Perkins stated:

A question has been raised regarding the proper interpretation of the provisions in the bill relating to the availability of survivor's benefits in those cases where the miner's death is unrelated to pneumoconiosis. We have been very concerned about the authority in current law to pay survivor's benefits in those situations; [the legislation] reflects that concern by eliminating prospectively the authority to initiate benefit payments when that happens. The administration expressed these same concerns in Deputy Under Secretary of Labor Robert Collyer's testimony before the Senate Labor Subcommittee, December 14, 1981.

I want to emphasize, however, that it is not the purpose of [the legislation], to deny survivor's benefits when complications of pneumoconiosis have caused a miner's death or where pneumoconiosis was a substantially contributing factor to that death. For example, pneumoconiosis may have been a substantially contributing cause of death in a case where the principal cause of death was pneumonia.

Of course, survivors would not be eligible for benefits in those situations where death was caused by a traumatic injury or an unrelated medical condition.

127 Cong.Rec. 31,747 (1981).

The legislative history is silent as to whether a psychological component would establish the necessary link between pneumoconiosis and death. Similarly, the regulations promulgated by the DOL do not address this issue other than to specify that no benefits are to be awarded if death stems from "traumatic injury" or from "a medical condition not related to pneumoconiosis." 20 C.F.R. § 718.205(c)(4).

To the degree that we find the legislative history helpful at all, we find it cuts against the interpretation now urged by the DOL. To begin with, the amendments were designed to limit, not expand benefits. Cost savings was the principal motivating force. Second, the legislative history is completely silent as to mental illness or depression being a condition which would trigger benefits even if caused by pneumoconiosis in whole or part. Pneumoconiosis is a progressive debilitating disease. Everyone suffering from pneumoconiosis would suffer some collateral mental discomfort or depression.

It is true, as the Director points out, that the amendments were not intended to deny survivor's benefits when pneumoconiosis was not the sole cause of death, but was a substantially contributing factor. However, the example given in the legislative history is death from a pneumoconiosis induced pneumonia. Similarly, the two examples used in the regulatory comments involved pneumoconiosis *physically* contributing to death. In our view, the "substantially contributing" lan-

---

4. We again note that the miner here was *denied* benefits while alive.

guage does not create an exception meant to swallow the rule. One generally, in a strict sense, never dies directly from pneumoconiosis, but from the failure of some other system resulting from the pneumoconiosis. The connection, heretofore, however, has always been physical, not mental. Had Congress meant to insert such a radical change, we believe that the legislative history and, more importantly, the statute itself would reflect this intent.

We now turn to the Director's argument that we should interpret the language in question by analogizing to state workers' compensation laws. The starting point for this argument is testimony given by Deputy Under Secretary of Labor Robert Collyer before a Senate subcommittee which was considering the 1981 amendments. Collyer testified that one of the purposes of the proposed amendments was to "make the Federal statute consistent with traditional workers' compensation principles by limiting survivors' benefits to cases where death was a result of black lung and not some unrelated event." Black Lung Benefits and Revenue Amendments of 1981: Hearings on S.1922 Before the Subcomm. on Labor of the Senate Comm. on Labor and Human Resources, 97th Cong. 1st sess. 17 (1981).

█ Apart from finding that the Under Secretary used the words "workers' compensation," we find no support in his remarks for the argument now being made by the DOL. In our view, the key word in Collyer's remarks was "limiting." He clearly was referring to the fact that workers' compensation laws, which provide for survivors' benefits, do not provide such benefits when death is unrelated to the work-connected injury.

We accept, for purposes of argument, that some states have awarded workers' compensation benefits to survivors when the worker's immediate cause of death was suicide. For us, however, the argument proves too much. Suicide may be compensable under workers' compensation laws when it is otherwise unrelated to an injury or illness. This is because workers' compensation laws provide an all-inclusive vehicle for compensating for work-related injuries or death. Such is not the case with the Black Lung Act. It is

*not* a workers' compensation statute for mine workers; instead, it is a very specific and limited piece of legislation designed to address a medical condition that inflicts miners with such frequency that it required its own set of rules and regulations, apart from any other workers' compensation coverage that may have been afforded to miners.

To the degree that any analogy might be helpful in interpreting the applicable regulations, we think a better one would be to compare suicide with the "traumatic injury" referenced as an exception in 20 C.F.R. § 718.205(c)(4).

### III.

In deciding that Congress manifested no intent that survivors' benefits should be awarded when a miner suffering from pneumoconiosis commits suicide, we also are guided by what we perceive to be the ramifications of a contrary ruling.

To begin with, suicide is no longer, if it ever was, a rare cause of death. As University of Michigan Law School Professor Yale Kamisar has explained:

> Although it once ranked twenty-second on the list of causes of death in the United States, it now ranks (depending on the particular year) eighth or ninth. Every year there are between 25,000 and 30,000 reported cases of suicide (and the number of cases is probably grossly underreported both because of the social stigma that attaches and because of the possible loss of life insurance benefits).

Yale Kamisar, *Are Laws Against Assisted Suicide Unconstitutional?*, 23 HASTINGS CENTER REP. 32, 38 (1993). As the population lives longer and medical research has the skills to prolong life even in the face of sure-fatal illnesses, suicide has become more of an accepted option, particularly for the elderly. Professor Kamisar's research supports this view:

> Although suicide occurs at an alarming rate among young people ... the highest suicide rates and the greatest number of suicides are found among people over the age of fifty. Indeed, for American white males, from childhood on, the risk of sui-

cide rises linearly with age until the eighth decade of life. Suicides by people over the age of sixty account for about 25 percent of all suicides.

*Id.* (footnote omitted). As the recent national publicity and debate over assisted suicide has dramatically shown, there is a substantial portion, if not a majority of persons, in our society who favor suicide being an accepted and legal method of terminating one's own life.

Perhaps the most troubling aspect of adopting the construction urged by the Director is the difficulty of establishing to any degree of certainty just what drives an individual to suicide, coupled with the relative ease in securing psychiatric testimony that would support a causal connection. Because these two propositions arguably sound contradictory, we elaborate.

In order to prove a claim for survivors' benefits in the face of a death by suicide, the survivor must prove that pneumoconiosis "was a substantially contributing cause of death." The Director concedes that neither the statute nor the regulations provide a definition for "substantially contributing." Although ultimately judicial gloss would provide a definition, the task would not be an easy one. Since the Sixth Circuit encompasses an area in which there is or has been significant coal mining activity, we have reviewed hundreds of black lung claims.[5] The typical claimant is elderly, or at least old beyond his years, and is afflicted with a variety of ailments. Indeed, the principal task in many of these cases is to determine whether the miner is disabled due to pneumoconiosis or from other causes. In addition, many claimants are in poor financial condition. When a person who meets this profile commits suicide, it would be a daunting task to sort out the cause or causes of such suicide.

Notwithstanding the difficulty of this task, it is clear beyond peradventure that a claimant likely would be able to find psychiatric testimony to support a causal connection. We are not suggesting that psychiatric testimony is "for sale," at least not to any greater degree than any other expert testimony; instead, the root of the problem is in the inherently subjective nature of psychiatric evaluations themselves. An analogy would be our law as it has developed relative to claims of disabling pain. Since pain is largely subjective, we have required that there be objective clinical evidence supporting a pain claim. *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847 (6th Cir.1986).

Although psychiatrists also use objective clinical testing as part of the evaluative process, objective tests cannot be administered to a dead person. Of necessity, the psychiatric evaluation, as it relates to causation in suicide cases, is usually after the fact.[6]

Psychiatry is far from an exact science, and we are reluctant to plunge the DOL and the courts into yet another battle of courtroom experts, unless Congress has decided that is the way it should be. We do not think that Congress, in adopting the cost-saving 1981 amendments, even considered this issue, much less mandated the result urged by the Director.

**AFFIRMED.**

---

5. We also have reviewed thousands of social security disability claims that raise many similar issues insofar as the evaluation of a claimant's physical condition is concerned.

6. We recognize that in the instant case the decedent saw a psychiatrist shortly before he died. Anti-depressant drugs were prescribed and, at least according to the discharge summary, the decedent left in an improved state of mind. There was no attempt, however, to sort out all of the things that may have contributed to decedent's depression because, at his age and in his general state of poor health, it made no difference with regard to the limited psychiatric assistance afforded.