James SCHEIDEMANN, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 95–3241.

United States Court of Appeals,
Third Circuit.

Argued Dec. 5, 1995.

Decided May 16, 1996.

Frank W. Hunger, Assistant Attorney General, Civil Division, David J. Kline, Assistant Director, Donald E. Keener, Jane Gomez, Vernon B. Miles, Christopher C. Fuller (argued), U.S. Department of Justice, Washington, DC, for Respondent.

Linda Kenepaske (argued), New York City, for Petitioner.

Before: SLOVITER, Chief Judge, and STAPLETON and SAROKIN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Petitioner James Enrique Scheidemann, a permanent resident alien, seeks review of an order of the Board of Immigration Appeals ("BIA") dismissing his appeal from an immigration judge's deportation order. Petitioner, who faces deportation on account of a 1987 drug trafficking conviction for which he has served over five years in prison, does not contest his deportability. Rather, arguing that he is eligible to apply for discretionary waiver of deportation under § 212(c) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1182(c), he urges us to reverse the BIA's finding that he is statutorily barred under that section from seeking discretionary relief because of his prior drug offense conviction.

Petitioner acknowledges, as he must, that § 212(c) plainly bars discretionary relief to aliens who have served at least five years' imprisonment for one or more "aggravated felonies," and that the Act's definition of "aggravated felony" includes drug trafficking offenses such as his. Because both the statutory bar and the underlying definition of "aggravated felony" were added to the Act by amendments enacted after petitioner's conviction, however, he argues that the BIA violated the presumption against retroactivity by applying the bar to his antecedent conviction. We find that the statutory bar does not have a retroactive effect as applied to petitioner's conviction, and we hold that the BIA correctly applied the statute in accordance with clear congressional intent. We will therefore deny the petition for review.

I.

Petitioner, a 49 year-old native and citizen of Colombia, has been a lawful permanent resident in the United States since 1959. His wife, children, parents and siblings are all United States citizens. In June 1987, petitioner was convicted in the United States District Court for the District of New Jersey of (1) racketeering in violation of 18 U.S.C. § 1962(c), (2) conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), (3) conspiracy to distribute and to possess with intent to distribute a controlled substance (cocaine) in violation of 21 U.S.C. § 846, (4) possession with intent to distribute a controlled substance (cocaine) in violation of 21 U.S.C. § 841(a)(1), and (5) use of a telephone to facilitate a drug conspiracy in violation of 21 U.S.C. § 843(b). Petitioner was sentenced to four concurrent ten-year terms for the racketeering and drug conspiracy and possession offenses, and to a four-year term, also to run concurrently, for the telephone offense. Petitioner actually served five years and ten months in prison.

In March 1992, while petitioner was still in prison, the Immigration and Naturalization Service ("INS") instituted deportation proceedings against him, charging him with deportability pursuant to 8 U.S.C. § 1251(a)(2)(B)(i) as an alien convicted of a controlled substance violation. At a deportation hearing held in November 1994, the immigration judge found petitioner deportable as charged. Petitioner then applied with the immigration judge for discretionary relief from deportation under § 212(c) of the Act. The INS opposed the application, arguing

that discretionary relief is unavailable under the plain language of § 212(c) to an alien who has served a sentence of at least five years for one or more "aggravated felonies," and that petitioner's drug trafficking offenses are "aggravated felonies" within the Act's definition thereof. In December 1994, the immigration judge denied petitioner's application for relief and ordered petitioner deported to his native country of Colombia.

Petitioner appealed to the BIA. The BIA affirmed, holding that the § 212(c) statutory bar applies to all convictions within the original definition of "aggravated felony," regardless of the date of conviction, if the petitioner filed the application for relief after the statutory bar became effective on November 29, 1990. This timely petition for review followed.

## II.

We have jurisdiction over this petition to review the BIA's dismissal of an appeal from a deportation order pursuant to 8 U.S.C. § 1105a(a) because the petitioner's residence (as defined in 8 U.S.C. § 1101(a)(33)) is in New Jersey and he timely filed this petition. The deportation order became final upon the BIA's dismissal of petitioner's appeal therefrom, 8 C.F.R. § 243.1, and petitioner has exhausted his administrative remedies as of right.

The framework for judicial review of an agency's construction of the statute it administers is well settled. "The starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter." *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993) (internal quotation marks and alteration omitted). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "In sum, the courts must respect the interpretation of the agency to which Con-

gress has delegated the responsibility for administering the statutory program ... unless that interpretation is arbitrary, capricious, or manifestly contrary to the statute." *Katsis v. INS,* 997 F.2d 1067, 1070 (3d Cir. 1993) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994).

## III.

Section 212(c) grants the Attorney General discretion to waive the exclusion of otherwise excludable resident aliens seeking to reenter the United States from abroad:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General [despite being otherwise excludable].... The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years.

8 U.S.C. § 1182(c). Though the statutory language expressly authorizes only a waiver of exclusion, courts have applied § 212(c) as also authorizing discretionary relief to deportable aliens who have not exited the United States. *E.g., Katsis,* 997 F.2d at 1070. The first quoted sentence is the waiver provision for which petitioner would be eligible but for the second quoted sentence, which is the statutory bar at issue.

When petitioner was convicted in 1987 and *a fortiori* at the time of his criminal conduct, there was no aggravated felony bar in § 212(c). All deportable aliens, even those convicted of a felony, were thus eligible to apply for a discretionary waiver. Congress added the statutory bar to § 212(c) by amendment in 1990 to restrict the availability of the discretionary waiver. *See* Immigration Act of 1990, Pub.L. No. 101–649, § 511(a), 104 Stat. 4978, 5052 (1990) (the "1990 amendment").[1] The 1990 amendment

---

1. The statutory bar as first enacted in § 511(a)

denied discretionary relief to any alien who has

expressly applies to all "admissions [and, by implication, deportations] occurring after the date of the enactment" of the amendment on November 29, 1990. § 511(b), 104 Stat. at 5052. The Attorney General has reasonably interpreted this to mean that the amendment applies to all applications for discretionary waiver submitted after November 29, 1990. 56 Fed.Reg. 50,033 (Oct. 3, 1991).

In 1987, the Act also lacked a definition of "aggravated felony." One was added to the definition section of the Act when Congress passed the Anti–Drug Abuse Act of 1988 ("ADAA"). Pub.L. No. 100–690, § 7342, 102 Stat. 4181, 4469–70 (1988). At that time, the significance of the definition was primarily in the context of statutory provisions setting forth the grounds for deportation and enhanced penalties for illegal entry of aliens convicted of such felonies. Prior to 1990, it had no significance in the context of discretionary waivers of deportation.

The 1988 definition of "aggravated felony" included "any drug trafficking crime as defined in section 924(c)(2) of title 18." [2] § 7342, 102 Stat. at 4469. This definition,

codified at 8 U.S.C. § 1101(a)(43), did not include a specific effective date. Petitioner does not dispute that this definition encompasses his drug trafficking offenses (as 18 U.S.C. § 924(c)(2) defines "drug trafficking crime" to include "any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.)"), but he argues that the definition cannot retroactively define his 1987 offenses of conviction as "aggravated felonies" for purposes of § 212(c).

■ The issue before us is whether the BIA properly interpreted the § 212(c) statutory bar to apply to aliens convicted of "aggravated felonies" as originally defined in 1988 even where the conviction antedates the enactment of both the statutory bar and the underlying definition of "aggravated felony." [3] Petitioner asserts that the BIA's interpretation is impermissible because it violates the presumption against retroactivity as articulated by the Supreme Court in *Landgraf v. USI Film Prod.,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and *Rivers v. Roadway Express, Inc.,* — U.S. —, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).[4] We

---

been convicted of "an aggravated felony and has served a term of imprisonment of at least 5 years." The language just quoted was subsequently clarified to read, as it presently does, "one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years." *See* Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub.L. No. 102–232, § 306(a)(10), 105 Stat. 1733, 1751 (1991). This technical change is of no significance to the issues presented here either in its text or its effective date—Congress directed that this technical amendment "shall take effect as if included in the enactment of the Immigration Act of 1990." § 310, 105 Stat. at 1759.

**2.** As will be discussed in more detail, the original 1988 definition of "aggravated felony" has twice been expanded by amendment to include additional crimes, but the definition has continuously included drug trafficking crimes such as those of which petitioner has been convicted. Petitioner does not contest this fact.

**3.** In its decision here, the BIA relied in part on its prior decisions in *Matter of A–A–,* Int. Dec. 3176 (BIA 1992) (holding that § 212(c) applies to all applications for relief filed after November 29, 1990, regardless of when conviction occurred, for offenses within the original definition of "aggravated felony"), and *Matter of Gomez–Giraldo,* Int. Dec. 3242 (BIA 1995) (reaffirming

*Matter of A–A–* and holding that its interpretation does not violate the presumption against retroactivity as articulated by the Supreme Court in *Landgraf v. USI Film Prod.,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and *Rivers v. Roadway Express, Inc.,* — U.S. —, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994)).

**4.** We reject petitioner's other two claims of error. First, petitioner asserts a violation of the *ex post facto* clause of the United States Constitution. As the BIA correctly noted, however, the prohibition against *ex post facto* laws does not apply to deportation proceedings, which are "purely civil action[s] to determine eligibility to remain in this country, not to punish.... The deportation hearing looks prospectively to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain." *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). While credible and forceful arguments have often been brought before the Supreme Court that the *ex post facto* clause should be applied to deportation proceedings, the clause "has been unswervingly held as inapplicable to matters of deportation." *United States v. Bodre,* 948 F.2d 28, 31–33 (1st Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1487, 117 L.Ed.2d 628 (1992). We accordingly reject petitioner's argument that the *ex post facto* clause applies here.

disagree.[5]

## IV.

The Supreme Court in *Landgraf* prescribed the analysis for determining whether Congress intended a statute to apply retroactively.

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

—— U.S. at ——, 114 S.Ct. at 1505. As the Court in *Landgraf* demonstrated, a court may determine congressional intent from the statutory text, by necessary implication from the statute taken as a whole, or from the statute's legislative history. *See id.* at —— – ——, 114 S.Ct. at 1491–96.

Here, neither the "aggravated felony" definition nor the § 212(c) statutory bar contains an "express command" that the aggravated felon bar applies to pre-enactment convictions. But, following the *Landgraf* analysis, there are two independent reasons why the BIA's interpretation of the statute does not violate the presumption against retroactivity. The first reason is that the statute does not have a retroactive effect. The second and more important reason is that, whether or not the statute would have a retroactive effect here, the text of the statute and its amendments clearly shows that Congress intended § 212(c) to apply to offenses within the original 1988 definition of "aggravated felony" regardless of the date of conviction. Thus, the BIA's interpretation of the statute is not only permissible, it is obligatory given Congress' clear intent as expressed in the statutory scheme as a whole.

## A.

We will first consider whether applying § 212(c) to pre-enactment convictions would have a "retroactive effect" within the meaning of *Landgraf*. The Supreme Court in *Landgraf* endeavored to resolve the "apparent tension" between two canons of statutory construction. "The first is the rule that a court is to apply the law in effect at the time it renders its decision," and the second "is the axiom that retroactivity is not favored in the law, and its interpretive corollary that congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." —— U.S. at ——; 114 S.Ct. at 1496 (internal quotation marks and alteration omitted). The *Landgraf* three-part analysis, quoted above, is the Court's resolution to this "apparent tension."

The Court explained that application of a statute to pre-enactment conduct does not necessarily give the statute a "retroactive" or

---

Second, petitioner creatively argues that, even if § 212(c) is fully applicable, his 70 months served should be prorated among the several offenses of conviction so that the time served for the three "aggravated felonies" works out to less than five years (it is undisputed that petitioner's two racketeering convictions are not "aggravated felonies" under the Act). This argument fails because petitioner was sentenced to *concurrent* sentences on all counts, and therefore he has served over five years on two of his aggravated felony counts. Petitioner thus meets the terms of the § 212(c) statutory bar.

5. We note that, in affirming the BIA's interpretation of the statute, we join all six of our sister courts of appeals that have previously evaluated and upheld the BIA's interpretation. *See Samaniego–Meraz v. INS*, 53 F.3d 254, 257 (9th Cir. 1995); *Asencio v. INS*, 37 F.3d 614, 617 (11th Cir.1994); *Campos v. INS*, 16 F.3d 118, 121 (6th Cir.1994); *De Osorio v. INS*, 10 F.3d 1034, 1039–41 (4th Cir.1993); *Buitrago–Cuesta v. INS*, 7 F.3d 291, 294 (2d Cir.1993); *Barreiro v. INS*, 989 F.2d 62, 64 (1st Cir.1993); *see also Cortes–Castillo v. INS*, 997 F.2d 1199, 1202 n. 1 (7th Cir.1993) (dictum).

"retrospective" [6] effect.

A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.... [F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

—— U.S. at ——, 114 S.Ct. at 1499 (citation and footnote omitted).

 The Court observed that "[t]he largest category of cases in which [it has] applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at ——, 114 S.Ct. at 1500. Although the Court quickly added that the presumption has not been limited to such cases, they represent perhaps the model context for application of the anti-retroactivity presumption. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at ——, 114 S.Ct. at 1497.

The provisions of the Civil Rights Act of 1991 at issue in *Landgraf* were held to be "retroactive in effect" because one provision allowed recovery of punitive damages (which increased deterrent and retributive aspects of the statute, and retroactive imposition of which "would raise a serious constitutional question") and the other, allowing recovery of compensatory damages, was "the type of legal change that would have an impact on private parties' planning" and would "attach an important new legal burden to [the defendant's] conduct." *Id.* at —— ——, 114

S.Ct. at 1505–06. The Court thus found that retroactive application of these provisions, where prior law afforded no relief, "c[ould] be seen as creating a new cause of action" and would have an "especially pronounced" impact on parties' rights. *Id.* at ——, 114 S.Ct. at 1506.

The *Landgraf* Court distinguished from statutes altering the legal consequences of prior conduct three categories of cases that have a great deal in common with the case before us. First, the Court observed, "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision [in a case involving pre-enactment conduct] is not retroactive." *Id.* at ——, 114 S.Ct. at 1501. As an example, the Court cited a provision of the Clayton Act which altered the standard for evaluating the propriety of injunctive relief against labor picketing.

The second class of cases noted by the Court as involving no true retroactivity is that involving "statutes conferring or ousting jurisdiction." *Id.* The law existing at the time jurisdiction is invoked governs such cases, according to the Court, "because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" *Id.* at ——, 114 S.Ct. at 1502 (quoting *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 100, 113 S.Ct. 554, 565, 121 L.Ed.2d 474 (1992) (Thomas, J., concurring)).

Finally, the Court in *Landgraf* observed that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Id.* It noted "the diminished reliance interests in matters of procedure," and observed:

Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive.

---

**6.** The Court used the terms "retroactive" and "retrospective" synonymously.

*Id.* at ——, 114 S.Ct. at 1502.[7]

In this case, the consequences of petitioner's criminal conduct were clear at the time of that conduct and they remain unchanged today. He was subject to possible criminal sanctions and deportation. The only relevant change in the law relates to the permissible scope of the Attorney General's discretion to grant relief from one of those consequences. Like statutes altering the standards for injunctive relief, this change has only a prospective impact. It is not designed to remedy the past but only to affect petitioner's future status with respect to the legality of his presence in the United States. Like statutes constricting the jurisdiction of a judicial body, these changes speak only to the power of a public agency. Finally, like legislation altering procedural rights, the relevant amendments in this case regulate secondary rather than primary conduct and infringe on no significant reliance interest. Given the facts that petitioner's pre–1987 conduct clearly subjected him to deportation as well as criminal sanctions, and that § 212(c), as it then existed, offered relief from the former only at the unfettered discretion of the Attorney General, petitioner does not, and could not, contend that his conduct was undertaken in reliance on the then current version of § 212(c).

We agree with the observation of the Court of Appeals for the Fourth Circuit when it was confronted with the issue that we here face. "In general, the concern regarding retroactive application of statutes is the deprivation of rights without notice and fair warning; such concerns are not present in this case.... In this case, Congress did not attach additional consequences [to past criminal activity] but merely withdrew a previously available form of discretionary relief." *De Osorio v. INS,* 10 F.3d 1034, 1042 (4th Cir.1993).

We hold, then, that the statutory provisions at issue here do not have a "retroactive effect" under the second part of the *Landgraf* analysis. Therefore, the presumption against retroactivity is irrelevant and the law in effect at the time of the decision must control.

**B.**

Because we hold that the BIA's interpretation of the statute does not violate the presumption against retroactivity, it is at least a permissible interpretation to which we would ordinarily defer. *Katsis,* 997 F.2d at 1070; *De Osorio,* 10 F.3d at 1042. Such deference is not necessary in this case, however, because the text of the relevant statutory provisions clearly shows that Congress intended the § 212(c) statutory bar to apply to pre-enactment convictions such as petitioner's.[8] And where "the intent of Congress is clear, that is the end of the matter." Good Samaritan, 508 U.S. at 409, 113 S.Ct. at 2157 (internal quotation marks omitted).

**1.**

First, we will consider whether Congress clearly intended the definition of "aggravated felony" itself to apply to convictions entered before enactment of the definition. As we have noted, this definition was added to the Act in 1988 with the passage of the ADAA when its significance was in contexts other than § 212(c). Nowhere does the ADAA expressly command that the term "aggravated felony" shall apply to convictions entered prior to the ADAA's enactment date. Nevertheless, despite the absence of any express command, it is clear from the relevant provisions of the ADAA that Congress intended the definition to apply to pre-enactment convictions.

The portion of the ADAA that is relevant here contains both the definition of "aggra-

---

7. Justice Scalia, in his concurring opinion, joined by Justices Kennedy and Thomas, agreed that the Court had found no retroactivity in cases falling within the three categories referenced in the Court's opinion. His explanation for the result in those cases differs somewhat from that of the Court, but that explanation, like that of the Court, counsels in favor of a finding of no retroactivity in this case.

8. Petitioner does not contest that Congress has the *power* to declare past criminal activity a new grounds for denial of discretionary relief from deportation, or even a new grounds for deportation. *See, e.g., Campos v. INS,* 16 F.3d 118, 122 (6th Cir.1994) (citing cases). The issue presented is instead one of congressional intent.

vated felony" and six substantive provisions that attach specific adverse immigration consequences to aggravated felonies. Three of these provisions, by necessary implication, show that Congress clearly intended the definition of "aggravated felony" to apply to pre-enactment as well as post-enactment convictions. For example, § 7345 of the ADAA enhanced the criminal penalties for the illegal reentry of an alien "whose deportation was subsequent to a conviction for commission of an aggravated felony." § 7345(a)(2), 102 Stat. at 4471. Congress expressly provided that these enhanced penalties "shall apply to any alien who enters, attempts to enter, or is found in, the United States on or after the date of the enactment" of the ADAA. § 7345(b), 102 Stat. at 4471. This section necessarily contemplates enhanced penalties for aliens convicted of aggravated felonies before the date of enactment in 1988, because the enhanced penalties apply on the date of enactment to aliens who attempt reentry following their deportation, which was in turn subsequent to conviction of an aggravated felony. We must construe the definition of "aggravated felony" to apply to pre-enactment convictions because it would be impossible otherwise to give effect to Congress' express command regarding the effective date of this substantive provision employing the term, and it is elementary that we must construe a statute so as to give effect to every word. *E.g., Sekula v. FDIC*, 39 F.3d 448, 454 & n. 16 (3d Cir.1994). By necessary implication, then, Congress clearly intended the definition of "aggravated felony" to apply to convictions entered prior to 1988.[9] If we were to construe the definition of "aggravated felony" to be prospective only, we would improperly render these express statutory provisions absurd.

The other three substantive provisions of the ADAA employing the "aggravated felo-

ny" term, each of which concerns deportation of aggravated felons, explicitly limit their application prospectively to aliens convicted of aggravated felonies "on or after the date of the enactment" of the ADAA. *See* §§ 7343(c) ("Deportation of Aliens Committing Aggravated Felonies"), 7344(b) ("Grounds of Deportation"), and 7347(c) ("Expedited Deportation Proceedings for Aliens Convicted of Aggravated Felonies"). Such expressly prospective language would be redundant if the definition of "aggravated felony" were construed to apply only to convictions entered on or after the effective date of the ADAA. Moreover, these provisions demonstrate that Congress knew well how to limit expressly the reach of a provision where it desired to do so, but Congress did not do so with respect to the definition section. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (noting that, where Congress includes particular language in one section of a statute but omits it from another section of the same act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion).

The design of the ADAA thus clearly demonstrates that Congress intended the temporally-unrestricted definition of "aggravated felony" to apply to pre-enactment convictions. It is only certain substantive provisions that Congress has expressly limited to apply prospectively to those aggravated felony convictions entered on or after the ADAA's enactment date. The definition of "aggravated felony" lacks an effective date not by oversight, but by design: a crime described in the original 1988 definition is an aggravated felony regardless of the date of conviction, but its immigration consequences will vary according to the effective date of the substantive provision employing the term. We must construe the definition to

---

9. Sections 7346 and 7349 are the two other provisions of the ADAA that similarly demonstrate Congress' clear intent that the definition of "aggravated felony" should apply to pre-enactment convictions. Section 7346 provides criminal penalties for aiding or assisting aliens who have previously been convicted of an "aggravated felony" to enter the United States, and Congress expressly commanded that that provision "shall apply to any aid or assistance which oc-

curs on or after the date of the enactment of this Act." § 7346(b), 102 Stat. at 4471. Likewise, § 7349 provides a ten-year bar on reentry into the United States of aliens convicted of an aggravated felony, and Congress expressly stated that the bar "shall apply to any alien convicted of an aggravated felony who seeks admission to the United States on or after the date of the enactment of this Act." § 7349(b), 102 Stat. at 4473.

include pre-enactment convictions in order to give meaningful effect to all the express provisions of the ADAA, both those that are expressly prospective and those that necessarily apply to pre-enactment convictions.

Subsequent amendments to the aggravated felony definition are consistent with the statutory scheme described above. As part of the Immigration Act of 1990—the statute that created the § 212(c) statutory bar—Congress amended the definition of "aggravated felony" to include certain additional offenses (including money laundering, crimes of violence, and foreign law violations). *See* Immigration Act of 1990, Pub.L. No. 101–649, § 501(a), 104 Stat. 4978, 5048 (1990). Congress specifically directed that these additional offenses are aggravated felonies only if "committed on or after the date of the enactment" of the 1990 amendment. § 501(b), 104 Stat. at 5048. This same section of the 1990 amendments also expanded the drug offenses qualifying as "aggravated felonies" to include "any illicit trafficking in any controlled substance (as defined in section 102 of the Controlled Substances Act)." § 501(a)(2), 104 Stat. at 5048. In contrast to the explicitly prospective application for the other, additional offenses, however, Congress expressly stated that the drug offense amendment "shall be effective as if included in the enactment of [the original definition in] section 7342 of the Anti–Drug Abuse Act of 1988." § 501(b), 104 Stat. at 5048. Thus, Congress limited the temporal scope of the aggravated felony definition only with respect to the new crimes added in 1990, but left intact the temporally unlimited language of the original, 1988 definition (under which petitioner's crimes fall).

■ Congress enacted similar amendments in 1994 to expand further the definition of "aggravated felony," and these amendments again left the 1988 definition intact in its temporal scope. *See* Immigration and Nationality Technical Corrections Act of 1994, Pub.L. No. 103–416, § 222(b), 108 Stat. 4305, 4322 (1994) ("The amendments made by this section shall apply to convictions entered on or after the date of enactment of this Act."). The 1994 amendments were enacted on October 25, 1994, well after the 1992 opinion in which the BIA first announced the interpretation it advances here,[10] and after five courts of appeals had published opinions affirming the BIA's interpretation.[11] In light of this case law, it is significant that Congress in 1994 did not also amend the original "aggravated felony" definition to make it absolutely prospective, for we must presume that Congress is aware of existing judicial interpretations of statutes. *E.g., Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1958–59, 60 L.Ed.2d 560 (1979); *James v. O'Bannon,* 715 F.2d 794, 804 (3d Cir.1983), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1746, 84 L.Ed.2d 812 (1985). Congress in 1990 and 1994 thus left intact the scheme it originally created in 1988.

Petitioner's crimes, because they come within the original 1988 definition, are thus "aggravated felonies" even though they antedate the enactment of the statutory provision, and any temporal restriction must come from the relevant substantive provision employing the term—in this case, § 212(c).

2.

The plain language of the § 212(c) statutory bar itself and of its effective date provision demonstrate that Congress intended the bar to become effective immediately upon enactment. Section 212(c) provides that any alien "who *has been convicted* of one or more aggravated felonies *and has served* for such felony or felonies a term of imprisonment of at least 5 years" is ineligible to apply for a discretionary waiver of deportation. 8 U.S.C. § 1182(c) (emphasis added). As noted above, this provision was added to § 212(c) by § 511(a) of the Immigration Act of 1990, 104 Stat. at 5052. The emphasized verb tenses indicate that the bar applies to aliens convicted at least five years prior to the provision's effective date. Moreover, this intent is confirmed by Congress' express command that the statutory bar would apply to all "admissions occurring after the date of

10. See note 3, *supra.*

11. See cases cited in note 5, *supra.*

the enactment" of the 1990 amendment (November 29, 1990).[12] § 511(b), 104 Stat. at 5052.

If we were to interpret § 212(c) as applying only to post-enactment convictions, by its terms the statutory bar would not have restricted the Attorney General's action for at least five years from the date of the bar's enactment. But § 212(c) is aimed at restricting the Attorney General's action, and Congress expressly commanded that the statutory bar was to take effect "after the date of [its] enactment" on November 29, 1990. "We believe the only sensible interpretation is that Congress intended its directions to go into effect promptly 'after the date of the enactment.'" *Buitrago–Cuesta v. INS*, 7 F.3d 291, 294 (2d Cir.1993).[13] A contrary interpretation would make § 212(c) "a super-prospectivity statute, and, thus, would render absurd Congress's provision that [§ 212(c)] would apply 'after' the date of enactment." *Id.* at 295.[14]

■ By its own terms, then, § 212(c) contemplates barring discretionary relief to aliens convicted of aggravated felonies in 1985 and before. If an alien has served at least five years' imprisonment for a felony conviction, as petitioner here has, the only limitations on the applicability of the § 212(c) bar are two: (1) that the application for relief must have been submitted after the date of the bar's enactment, and (2) that the conviction must have been for an "aggravated felony" as defined in the Act. Because petitioner applied for § 212(c) relief after November 29, 1990, and because his crimes concededly come within the 1988 definition of "aggravated felony," he is properly subject to the statutory bar.

We hold, therefore, that Congress intended § 212(c) to restrict the Attorney General's power to exercise discretionary relief immediately after enactment of the bar on November 29, 1990, with respect to aliens who have served at least five years' imprisonment for crimes defined as "aggravated felonies" under the original 1988 definition thereof, regardless of the conviction date.

## V.

We thus conclude that § 212(c)'s bar applies to all convictions under the original 1988 definition of "aggravated felony," regardless of the conviction date, where the alien applied for discretionary relief after the effective date of the 1990 amendment. Accordingly, the petition for review will be denied.

SAROKIN, Circuit Judge, concurring.

I agree with the majority's carefully written opinion that Congress clearly intended the amendment to § 212(c), barring aliens convicted of aggravated felonies who have served five or more years from seeking a deportation waiver, to apply to pre-enactment convictions.

My concurrence is mandated by the unrealistic conclusion in longstanding Supreme Court precedent that deportation is not a form of criminal punishment, but rather a civil remedy aimed at excluding unwanted

12. As noted above, the literal text of § 212(c) applies to legal resident aliens seeking re-admission after going abroad, but we have held that § 212(c) applies equally to deportation proceedings. *Katsis,* 997 F.2d at 1070. The Attorney General has interpreted the § 212(c) statutory bar as applying to all applications for discretionary waiver submitted after November 29, 1990, the date of enactment of the 1990 Act. 56 Fed. Reg. 50,033 (Oct. 3, 1991).

13. On this same point, the Court of Appeals for the First Circuit reasoned as follows: "If Congress believed seven years' residence insufficient to entitle aliens to waivers if they had served five or more years imprisonment for committing an aggravated felony, it makes small sense that so substantial a stricture should not go into effect for five years from enactment." *Barreiro v. INS,* 989 F.2d 62, 64 (1st Cir.1993).

14. In reaching our conclusion, we are mindful of the fact that § 212(c) necessarily applies super-prospectively with respect to those specific offenses added to the definition of "aggravated felony" by the 1990 and 1994 amendments. But the super-prospective effect of some offenses is not due to the terms of § 212(c), which is simply to take effect "after" its enactment, but rather is due to the underlying definition of what constitutes an "aggravated felony." Section 212(c) has no such necessary prospectivity with respect to aggravated felonies such as petitioner's because, as discussed above, offenses described in the original 1988 definition are "aggravated felonies" regardless of the date of conviction.

aliens, and that therefore the Ex Post Facto Clause does not apply to legislation affecting deportation. Majority Opinion, at 1520 n. 4 (citing *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984)); *see also Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952).

The legal fiction that deportation following a criminal conviction is not punishment is difficult to reconcile with reality, especially in the context of this case. Mr. Scheidemann entered this country at age twelve; he has lived here for thirty-six years; he has been married to an American citizen for twenty-four years; he has raised three children all of whom are American citizens; his elderly parents are naturalized citizens; two of his four siblings are naturalized American citizens, and all four of them reside permanently in the United States; he has no ties to Colombia, the country to which he is to be deported; and he has fully served the sentence imposed upon him. If deportation under such circumstances is not punishment, it is difficult to envision what is.

I think the deportation of aliens for the commission of crimes is clearly punishment. If Mr. Scheidemann's deportation could be characterized, as it should be, as punishment, I would conclude that the statutory bar to the discretionary waiver is a violation of the Ex Post Facto Clause of the Constitution.

### I.

The Constitution provides that "[n]o state shall ... pass any ... ex post facto law." U.S. Const. Art. 1, § 10. This clause prohibits the government from applying laws that "'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Department of Corrections v. Morales*, —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990)). "[A]ny statute ... which makes more burdensome the punishment for a crime, after its commission" has long been held to implicate the Ex Post Facto Clause,

*Collins*, 497 U.S. at 42, 110 S.Ct. at 2719 (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)), a provision concerned with "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981).

Various types of laws that serve to increase the punishment after an individual has committed an action have been found to violate the Ex Post Facto Clause. For example, the Supreme Court found that the Ex Post Facto Clause had been violated when defendants were sentenced under a statute requiring a sentence of fifteen years when the law in effect at the time of the offense gave the judge discretion to impose a lower sentence. *Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937). Even though the defendants conceivably could have been sentenced to fifteen years under the prior statute, the court found the Ex Post Facto Clause violated because "the measure of punishment prescribed by the later statute is more severe than that of the earlier." *Id.* Similarly, in *Weaver*, the Supreme Court found that a Florida statute altering the availability of "gain time for good conduct" was a violation of the Ex Post Facto Clause. *Weaver*, 450 U.S. at 36, 101 S.Ct. at 968. In arriving at its conclusion, the Court explained that a statute may violate the Ex Post Facto Clause "even if it alters punitive conditions outside the sentence, ... [where the statute] substantially alters the consequences attached to a crime already completed and therefore changes 'the quantum of punishment.'" *Id.* at 32–33, 101 S.Ct. at 966.

In addition, several courts of appeals, including our own, have found that the Ex Post Facto Clause is violated when a defendant's eligibility for parole release is adversely affected under a statute that was not in effect at the time of the defendant's crime. *See, e.g., Geraghty v. United States Parole Commission*, 579 F.2d 238, 265 (3d Cir.1978) ("[W]e conclude that were a statute to deprive already incarcerated or sentenced pris-

oners of the possibility of parole for the first 26 months of their sentence, when such was not the situation at the time of the sentence, the statute would [violate the Ex Post Facto Clause]"), *vacated on other grounds,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *United States v. Paskow,* 11 F.3d 873, 879 (9th Cir.1993) (explaining that "the ex post facto clause is violated when a defendant's eligibility for release is adversely affected under a statute that was not in effect at the time of the defendant's underlying crime" and collecting cases); *Fender v. Thompson,* 883 F.2d 303, 305 (4th Cir.1989) (collecting cases); *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 176 (7th Cir.1979) (treating "possibility of parole as an element of 'punishment' "); *Shepard v. Taylor,* 556 F.2d 648, 654 (2d Cir.1977) ("Since parole eligibility is considered an integral part of any sentence ..., official port-sentence [sic] action that delays eligibility for supervised release runs afoul of the *ex post facto* prescription."). The Supreme Court itself, while never having ruled explicitly on this issue, has strongly cautioned in *dicta* that "a repealer of parole eligibility previously available to imprisoned offenders would clearly present the serious question under the *ex post facto* clause ... of whether it imposed a 'greater or more severe *punishment* than was prescribed by law at the time of the offense.' " *Warden v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974) (quoting *Rooney v. North Dakota,* 196 U.S. 319, 325, 25 S.Ct. 264, 265, 49 L.Ed. 494 (1905)) (emphasis in original). As the Court explained, "only an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole." *Id.* at 662, 94 S.Ct. at 2538.

I am convinced that if a statute repealing the eligibility of an inmate for parole would violate the Ex Post Facto Clause if applied to prisoners who committed their crimes before the enactment date of the statute, the Ex Post Facto Clause likewise should prohibit the application of the section 212(c) waiver

bar to aliens who committed an aggravated felony before the bar was enacted.

A defendant who is sentenced to seven years in prison with eligibility for parole after five years is much like an alien convicted of a crime for which he may be deported who is eligible to apply for a waiver under section 212(c). Parole is not guaranteed, nor is the waiver of deportation. A Parole Board makes a decision whether to grant parole based on issues such as good behavior, prognosis for rehabilitation and family and community ties, just as an immigration judge assessing whether to waive deportation under 212(c) weighs issues of rehabilitation and family and community ties. Both decisions are discretionary; however, as noted by the Eleventh Circuit in summarizing Supreme Court jurisprudence, "the mere presence of some discretion both before and after the change in law does not in and of itself foreclose an ex post facto claim." *Jones v. Georgia State Board of Pardons and Paroles,* 59 F.3d 1145, 1149 (11th Cir.1995) (citing *Miller v. Florida,* 482 U.S. 423, 432–33, 107 S.Ct. 2446, 2452–53, 96 L.Ed.2d 351 (1987)). "[A] law may [violate the Ex Post Facto Clause] not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory." *Weaver,* 450 U.S. at 32 n. 17, 101 S.Ct. at 966 n. 17. Thus, although an inmate may fail in his efforts to persuade a Parole Board to exercise its discretion to grant him parole— just as an alien may fail in his efforts to persuade an Immigration Judge to exercise her discretion to grant him a deportation waiver—the removal of that discretion would constitute a violation of the Ex Post Facto Clause.

Furthermore, given that parole eligibility is "considered an integral part of any sentence," *Shepard,* 556 F.2d at 654; *see also Warden,* 417 U.S. at 658, 94 S.Ct. at 2535–36, I think that the availability and likelihood of a deportation waiver should also be so considered.[1] In explaining the basis for its con-

1. I note that it is not critical that the availability of a deportation waiver be considered part of the sentence to be invalidated by the Ex Post Facto Clause. The Ex Post Facto Clause has been found to be violated by statutes that alter the

punitive conditions outside a sentence. *Weaver,* 450 U.S. at 32, 101 S.Ct. at 966. For example, the Supreme Court has concluded that a statute requiring solitary confinement before an execution is ex post facto when applied to someone

clusion that parole eligibility or gain time should be considered part of the sentence for a crime, the Supreme Court noted that a defendant may consider gain time or parole eligibility in deciding whether to enter a plea bargain. *See Weaver,* 450 U.S. at 32, 101 S.Ct. at 966 (citing *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Warden,* 417 U.S. at 658, 94 S.Ct. at 2535–36). An alien defendant, in addition to considering factors such as parole eligibility, would likely consider his or her eligibility to apply for a deportation waiver as well in deciding whether to plead or contest the charges. Just as the Supreme Court has found that "only an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole," *Warden,* 417 U.S. at 662, 94 S.Ct. at 2538, only an unusual alien defendant could be expected to think he was not suffering a penalty when he was rendered deportable and then deprived of any eligibility to seek a waiver of deportation.

## II.

The Supreme Court, however, has long held that deportation is not a punishment, but rather a mere administrative action:

> A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish.... The deportation hearing looks prospectively to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain.

*Lopez–Mendoza,* 468 U.S. at 1038, 104 S.Ct. at 3483. Therefore, deportation laws are not subject to the Ex Post Facto Clause. *See Galvan,* 347 U.S. at 531, 74 S.Ct. at 743 (holding that "the *ex post facto* Clause ... has no application to deportation"); *Harisiades,* 342 U.S. at 594, 72 S.Ct. at 521 (1952) (holding that the Ex Post Facto Clause does not apply to deportation orders because "[d]eportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure");

*Mahler v. Eby,* 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924) ("It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment."); *Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913) (holding that the determination that an alien is an undesirable person "is not a conviction of crime, nor is the deportation a punishment; it is simply a refusal by the Government to harbor persons whom it does not want") (citing *Fong Yue Ting v. United States,* 149 U.S. 698, 707, 728, 730, 13 S.Ct. 1016, 1019–20, 1027–28, 1028–29, 37 L.Ed. 905 (1893); *Wong Wing v. United States,* 163 U.S. 228, 231, 16 S.Ct. 977, 979–80, 41 L.Ed. 140 (1896); *Zakonaite v. Wolf,* 226 U.S. 272, 275, 33 S.Ct. 31, 32, 57 L.Ed. 218 (1912); *Tiaco v. Forbes,* 228 U.S. 549, 33 S.Ct. 585, 57 L.Ed. 960 (1913)).

If not bound by these precedents, I would reject this distinction. While there is certainly a line to be drawn between adverse consequences of a conviction and actual "punishment" for purposes of the Ex Post Facto Clause, I think that it is plain that deportation falls on the "punishment" side of the line, as made clear by this court's recent decision, *Artway v. Attorney General of the State of New Jersey,* 81 F.3d 1235 (3d Cir.(N.J.)). There we engaged in a lengthy analysis of Supreme Court case law concerning the definition of "punishment" for purposes of the Ex Post Facto Clause, the Bill of Attainder Clause, and the Double Jeopardy Clause. *Id.* at 1254–64. We synthesized the case law and articulated a three-part analytical framework for determining whether legislative measures should be considered "punishment." Under this framework, each prong of the test must be met in order for a measure to be found *not* punitive.

First, we consider whether the legislature intended the legislation to be punishment, "i.e., retribution was one of its actual purposes." *Id.* at 1262–63 (citing *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960)). If so, the legislation should be considered to create a

---

who committed a capital offense before it was enacted. *Id.* (comparing *In re Medley,* 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890) with

*Holden v. Minnesota,* 137 U.S. 483, 11 S.Ct. 143, 34 L.Ed. 734 (1890)).

punishment. If, however, " 'the restriction of the individual comes about as a relevant incident to regulation,' the measure will pass this first prong." *Id.* (citing *De Veau,* 363 U.S. at 160, 80 S.Ct. at 1155).

Second, we look to the "objective" purpose of the legislature. In doing so, we consider whether the law can be explained "solely by a remedial purpose." *Id.* (citing *United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989)). If not, it is punishment. If it can be fully explained by a remedial purpose, we consider whether historically, the measure has nonetheless been considered punishment and whether any deterrent purpose it might have overwhelms its salutary purpose. If either is true, the legislation is considered punishment. Id.[2]

Third, even if the legislation is not found to be punishment under the above two prongs, we consider the "effects of the measure." *Id.* at 1263. *"If the negative repercussions— regardless of how they are justified—are great enough, the measure must be considered punishment." Id.* (emphasis added). Thus, regardless of whether the legislature truly intended only to serve a remedial purpose such as alleviating this country of the burden of hosting unwanted aliens, a legislative measure should be considered punishment if it has "great enough" "negative repercussions."

Under this scheme, there can be little doubt that the statutory bar to 212(c) waivers of deportation is a punishment. Even if it is accepted that Congress's intent in creating the bar was purely remedial and that any deterrent purpose it serves does not overwhelm its "salutary" effect of ensuring that aliens convicted of aggravated felonies are deported—no matter how strong their family ties are and how young they were when they first arrived in the United States—it is clear that the bar has "great enough" "negative repercussions" to warrant its classification as "punishment."

In *Artway,* we explained that, while "[t]he caselaw does not tell us where the line falls that divides permissible from impermissible effects, . . . we know the 'matter of degree' is somewhere between imprisonment and revocation of citizenship on the one hand, and loss of a profession or benefits on the other." *Id.* at 1266 (comparing *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 . . . (1987) (increasing incarceration is "punishment") and *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (revoking citizenship is "punishment") with *De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (forbidding work as union official is not "punishment"); *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revoking medical license is not "punishment") and *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (terminating social security benefits is not "punishment")).

Deportation of an alien who has resided in this country for thirty-six years to a country which he has not visited since he left it at age twelve has enormous negative repercussions, perhaps even more so than increased incarceration, which is clearly considered "punishment." *See id.* (citing *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987)). At the times when Mr. Scheidemann committed his crime, when he was convicted, and when he was sentenced, he was eligible to apply for a waiver of deportation; the facts presented indicate there was a fair possibility of such a waiver being grant-

---

2. This second prong actually has three subparts: First, can the law be explained solely by remedial measures? . . . If not, it is punishment. Second, even if some remedial purpose can fully explain the measure, does a historical analysis show that the measure has traditionally been regarded as punishment? . . . If so, and if the text or legislative history does not demonstrate that this measure is not punitive, it must be considered "punishment." Third, if the legislature did not intend a law to be retributive but did intend it to serve some mixture of deterrent and salutary purposes, we must determine (1) whether historically the deterrent purpose of such a law is a necessary complement to its salutary operation and (2) whether the measure under consideration operates in its "usual" manner, consistent with its historically mixed purpose. . . . Unless the partially deterrent measure meets both of these criteria, it is "punishment." If the measure meets both of these criteria and the deterrent purpose does not overwhelm the salutary purpose, it is permissible.

*Artway,* 81 F.3d at 1263 (citations omitted).

ed. With the passage of the statutory bar to the waiver, however, deportation became inevitable. As noted by the Second Circuit, deportation is a "sanction which in severity surpasses all but the most Draconian criminal penalties." *Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977).

Even the Supreme Court has recognized the incredibly harsh punitive nature of deportation, *see, e.g., Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948) (explaining that "'deportation is a drastic measure and· at times the equivalent of banishment or exile.... It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty'"), but it has felt constrained by its prior decisions as we are. As explained at great length by Justice Frankfurter:

> [S]ince the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the *ex post facto* Clause, even though applicable only to punitive legislation, should be applied to deportation.
>
> But the slate is not clean.... [T]here is not merely a page of history ... but a whole volume.... [W]hatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation.

*Galvan,* 347 U.S. at 531, 74 S.Ct. at 742–43.

The Supreme Court, of course, may revisit its own precedents. If it could not, *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), would still be good law. *See also Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995) (overruling *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990)). I suggest that now is the time to wipe the slate clean and admit to the long evident reality that deportation is punishment. To conclude that it is not punishment for a person to be banished from the country in which he has lived for thirty-six years, to be denied the love and presence of his wife, children and parents, and to be sent to a country to which he has no ties, is to deny reality. Given the choice, I would imagine most persons would choose prison. As Justice Brewer once commented in dissent, "If

banishment of this sort be not a punishment, and among the most severest of punishments, it would be difficult to imagine a doom to which the name can be applied." *Fong Yue Ting,* 149 U.S. at 741, 13 S.Ct. at 1033 (1893) (Brewer, J. dissenting) (quoting Madison in 4 Elliot's Deb. 554, 555).

### III.

For the foregoing reasons, I conclude that the longstanding rule that the Ex Post Facto Clause does not apply to deportation laws should be revisited to reflect the harsh reality that deportation is punishment. Because I am bound to follow precedent, however, I have no option but to concur in the opinion of my colleagues affirming the decision of the Board that deportation is not subject to the Ex Post Facto Clause and that, accordingly, Mr. Scheidemann is not eligible to apply for a § 212(c) waiver.