## In re FOXCROFT SQUARE COMPANY (Foxcroft Management Corporation), Debtor.

### Bankruptcy Nos. 93–11639DAS, 93–11640DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 10, 1996.

Michael J. Cordone, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Abington Club.

Reaves C. Lukens, Appraiser, Philadelphia, PA.

David P. Adams, Assistant U.S. Trustee, Philadelphia, PA.

Frederic Baker, Assistant U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

FOXCROFT SQUARE COMPANY and FOXCROFT MANAGEMENT COMPANY, jointly administered debtors ("the Debtors"), and the United States Trustee ("the Trustee"), have placed before this court the issue of whether the Trustee may collect post-confirmation quarterly fees pursuant to 28 U.S.C. § 1930(a)(6), as amended, effective January 26, 1996 ("the Law"). Finding that the Law does not operate retroactively in light of the Trustee's present demand for only those fees falling due after the effective date of the Law, and that no factors are present which rise to the level necessary to constitute a violation of the "takings clause" of the fifth amendment to the United States Constitution, the Trustee's demand is sustained.

### B. FACTUAL AND PROCEDURAL HISTORY

The facts of these cases are as long and complex as the issue presented is narrow. We will brush upon only those aspects of the factual and procedural history of the cases which are necessary to give form to the issue presented.

The Debtors commenced their respective bankruptcy cases on March 22, 1993, by filing separate voluntary petitions under Chapter 11 of the United States Bankruptcy Code. On March 25, 1993, we granted a motion allowing these cases to be jointly administered.

Much later, after a long series of disputes, hearings, and subsequent resolutions, we entered an order ("the Confirmation Order") on October 10, 1995, confirming the Debtor's Modified Sixth Joint Chapter 11 Plan ("the Plan"). The very long lapse between the filing of these cases and plan confirmation was attributable to the complexity of the financing of the Debtors' realty asset, a mul-ti-use network of facilities including a nine-hole golf course, located in Jenkintown, Pennsylvania; the last-minute frustration of several earlier plans for partial disposal of these assets; and lengthy negotiations over the terms of a plan between the Debtors and the ultimate purchaser of all of the realty assets, the Galman Group ("Galman"). The final version of the Plan was conceived on the eve of our preparing to decide whether to confirm competing plans of the Debtors and Galman.

Pursuant to the Plan, the sale of the remainder of the Debtors' realty assets to Galman closed on February 20, 1996. On or about March 6, 1996, the Debtors distributed proceeds of the sale of about $850,000 in full satisfaction of all secured claims and partial satisfaction of unsecured claims. The Debtors allege that they expect a second distribution to unsecured creditors by the end of June 1996, and a final distribution no later than the fourth quarter of 1996.

On April 25, 1996, in an effort to spur the closing of these cases, we entered an order providing that, unless a motion to keep these cases open was filed within fifteen (15) days, a final decree would be entered and the cases would be closed without further notice or hearing. In response thereto, the Trustee filed the Motion to Delay Entry of Final Decree and Request for Hearing ("the Motion") which brought the matter at issue before us for decision.

In the Motion, the Trustee seeks to delay entry of a final decree in these cases until he can collect post-confirmation quarterly fees pursuant to the Law, as amended. While the Motion, as filed, was not clear on this issue, the Trustee has now declared that he does not seek to collect fees from October 10, 1995, the Confirmation Date, but only from January 26, 1996, the effective date of the Law.

The Motion was scheduled for a hearing on June 5, 1996, at which time this court also scheduled a status hearing for attempting to determine when these cases could be closed. The Trustee indicated that he believed that certain modest pre-confirmation fees were also due, but both parties agreed that, upon

our resolution of the parties' dispute regarding the Debtors' liability for post-confirmation fees, determination of the total § 1930(a)(6) fees payable could be readily amicably resolved by them. In our Order of June 6, 1996, which was intended to expedite the resolution of all outstanding issues preventing closure of this case, we provided that the Debtors' appraiser was obliged to file a supplemental fee application on or before June 21, 1996 (which he did); the Debtors were obliged to file any adversary proceeding against the Abington Club, which operated the golf course on the realty, on or before July 5, 1996; the parties were given until June 17, 1996, to file briefs addressing the issue of whether post-confirmation fees were chargeable to the Debtors; and, in light of the Debtors' expression of an intention to have these cases closed before the end of this year, scheduled a further status hearing to monitor the progress towards that end on July 17, 1996.

Both parties filed timely briefs addressing the issue of whether post-confirmation quarterly Trustee fees were payable. The Debtors relied heavily on the only known reported case interpreting this issue, which initially ruled in their favor, *In re Central Florida Electric, Inc.*, 194 B.R. 280 (*"Cent. Fla. I"*), *reconsidered,* 197 B.R. 380 (Bankr.M.D.Fla. 1996) (*"Cent. Fla. II"*). Although the Order in *Cent. Fla. II,* effectively reversing *Cent. Fla. I* as to fees chargeable after the effective date of the Law, was attached to his initial brief, the Trustee could apparently not restrain himself from submitting a self-styled "supplemental brief" in reply to the Debtors' submission relying on *Cent. Fla. I.* Such restraint should have been exercised. "This court has repeatedly expressed its disdain for such [unsolicited supplementary] submissions, for the reasons stated in *In re Jungkurth,* [74] B.R. 323, 325–26 (Bankr.E.D.Pa. 1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333 (E.D.Pa.1988)." *In re Rosco Investors, L.P.,* 1996 WL 107503, at *2 (Bankr.E.D.Pa. March 6, 1996). We appreciate the Debtors' restraint, especially in the face of a devastating reversal of its principal supporting authority, of which their counsel was doubtless unaware when they submitted their brief.

## C. DISCUSSION

### 1. CONGRESSIONAL INTENT SUPPORTS THE TRUSTEE'S PRESENT POSITION THAT AMENDED § 1930(a)(6) PERMITS THE COLLECTION OF POST–AMENDMENT, POST–CONFIRMATION QUARTERLY FEES FROM JANUARY 26, 1996, FORWARD IN ALL CASES.

Prior to the amendment in issue, 28 U.S.C. § 1930(a)(6) required a Chapter 11 debtor to pay quarterly fees to the Trustee "until a plan is confirmed or the case is converted or dismissed, whichever occurs first." On January 26, 1996, Congress passed Pub.L. 104–99, 110 Stat. 26 (1996), the Balanced Budget Downpayment Act, I ("the Act"). Section 211 of the Act, 110 Stat. 26, 37–38 (1996), provides, *inter alia,* that "the General Provisions for the Department of Justice included in title I of the aforementioned conference report are hereby enacted into law." The "aforementioned conference report" referred to above includes § 111(a) of the General Provisions for the Department of Justice in title I of House Report 104–378, printed in 141 CONG.REC. H13874, H13878 (daily ed. Dec. 4, 1995), which provides that "Section 1930(a)(6) of title 28, United States Code, is amended by striking the words "'a plan is confirmed or.'" *Id.* Thus, the Law now provides that the Trustee may collect quarterly fees "until the case is converted or dismissed, whichever occurs first."

With respect to the legislative history of the Law, Pub.L. 104–91, § 101(a), states that the amendment is enacted as "provided for in the conference report and joint explanatory statement of the Committee of Conference (House Report 104–378)...." In the "joint explanatory statement of the Committee of Conference," Title I–Department of Justice, of House Report 104–378 ("The Joint Statement"), printed in 141 CONG.REC. H13893, § 111(a) of House Report 104–378, the amendment to § 1930(a)(6) is explained more clearly. A section entitled "United States Trustee System Fund" states, in pertinent part, as follows:

In addition, under section 111, the conferees agree to include an extension of post-confirmation quarterly fee payments made under Chapter 11 as proposed in both the House and Senate bills *and expect that these fees will apply to all pending Chapter 11 cases with confirmed reorganization plans* (emphasis added).

141 CONG.REC. H13894.

Another section within the Joint Statement entitled "Department of Justice—General Provisions," under § 111, states as follows:

The conference agreement includes section 111 as proposed in the House and Senate Bills, which extends the quarterly fee payments for debtors under Chapter 11 of the Bankruptcy Code to include the period from when a reorganization plan is confirmed by the Bankruptcy Court until the case is converted or dismissed. *The conferees intend that this fee will apply to both pending and new cases* (emphasis added).

141 CONG.REC. H13899.

▇ In reviewing the above legislative history, it is clear that Congress intended that the amended statute would apply to *all* pending Chapter 11 cases with confirmed reorganization plans. The Debtors' reorganization plan in this case was confirmed on October 10, 1995, prior to the January 26, 1996, effective date of the Law, and remains open and pending at this time. Therefore, we conclude that Congress intended the amendment to apply to debtors situated like the instant Debtors.

We must further note that the Law was amended as part of the Act. This fact adds to our understanding as to why Congress intended the amended statute to apply to a debtor with a confirmed reorganization plan.

The United States Trustee program is part of the Department of Justice ("the DOJ"). The purpose of the Act was to assist in balancing the federal budget, particularly that aspect funding the DOJ. Congress's goal was, then, trying to raise additional funds for the DOJ in balancing the budget. It is clear that interpreting the Law to allow debtors whose plans were confirmed prior to the amendment serves this revenue-gathering purpose.

The issue of Congressional intent is prominently discussed in the only pertinent authority, the two aforementioned *Cent. Fla.* opinions. In *Cent. Fla. I,* the court noted that the debtor had its Chapter 11 reorganization plan confirmed on October 26, 1995. 194 B.R. at 281. After having substantially consummated its plan, the debtor thereafter filed a motion seeking the entry of a final decree, to which the Trustee objected on the ground that, pursuant to the Law, the debtor owed quarterly fees to the Trustee until the case was either converted or dismissed. *Id.*

In *Cent. Fla. I,* the court interpreted the Trustee's allegations as requesting quarterly fees from the debtor for the period from the confirmation date of the plan, October 26, 1995, until the case was converted or dismissed. *See Cent. Fla. II,* 197 B.R. at 380–81. The *Cent. Fla. I* court thus framed the issue as whether the statute applied retroactively in that light. In that opinion, the court found "no indication of Congress' intent regarding the retroactive applicability of the amended statute." 194 B.R. at 282. Believing that the Trustee urged retroactive application of the Law and that the legislative history was silent on this point, the *Cent. Fla. I* court applied the "judicial default rules" set forth in *Landgraf v. USI Film Products,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1496–1505, 128 L.Ed.2d 229 (1994), which include a presumption against retroactivity. *Id.* at ——, 114 S.Ct. at 1504.

Subsequently, the Trustee filed a motion for reconsideration, modifying, or possibly clarifying for the first time, its prior position and submitting all of the relevant legislative history referenced herein. This submission generated *Cent. Fla. II,* in which the court emphasized that the Trustee had modified its prior position and "now is seeking fees *only* from the Effective Date to the entry of final decree, not from the earlier confirmation date," *id.* at 381, and that the legislative history did support collection of post-confirmation fees from the date of enactment forward. The *Cent. Fla. II* decision accordingly finally accepted the Trustee's position. *Id.* at 381–82. We agree with the *Cent. Fla. II*

result in most relevant respects, notably its ultimate conclusion that the legislative history supports a congressional intent to collect post-confirmation quarterly fees from all debtors falling due after the effective date of the Law, irrespective of when their case was filed or their plan was confirmed.

2. *THE DEBTORS' CONTENTIONS THAT AMENDED § 1930(a)(6) APPLIES RETROACTIVELY AND VIOLATES THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT CANNOT BE SUSTAINED.*

■ The Debtors rely heavily on the subsequently-withdrawn analysis of *Cent. Fla. I,* citing *Landgraf* for the principle that the Law operates retroactively, and, principally, *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994), for the principle that such a retroactive application of the statute violates the fifth amendment "takings clause." That clause protects against "private property['s] be[ing] taken for public use, without just compensation."

■ Initially, we agree, as far as it goes, with *Cent. Fla. II* 's ultimate conclusion that the amendment in issue "is no longer necessarily retroactive." 197 B.R. at 381–82. We would state more positively, applying the principles of *Landgraf* as interpreted in a recent decision controlling on us, *Scheidemann v. Immigration & Naturalization Service,* 83 F.3d 1517 (3d Cir.1996), that the Law definitely does not have a "retroactive effect."

Quoting *Landgraf, Scheidemann* begins by reciting the following principles, 83 F.3d at 1521:

"When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liabili-

ty for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."

511 U.S. at ——, 114 S.Ct. at 1505. As the Court in *Landgraf* demonstrated, a court may determine congressional intent from the statutory text, by necessary implication from the statute taken as a whole, or from the statute's legislative history. *See id.* at ——, 114 S.Ct. at 1491–96.

■ Unlike the statute at issue in *Scheidemann,* we have here, as indicated by our conclusions at pages 102–104 *supra,* legislative history which prescribes the Law's "proper reach," and thus we have no need to resort to "judicial default rules." However, were we required to resort to such rules, notably the "presumption against retroactivity," *id.* at 1522, we would be required to determine whether the Law has a "retroactive effect." *Id.*

*Scheidemann* notes that the Court, in *Landgraf,* applied the "presumption against retroactivity" because the provisions of the law in issue in *Landgraf* affected contractual or property rights. *Id.* However, the court then went on to note that three categories of cases involving statutes which did not place contractual or property rights so strongly in issue, but were rather "statutes altering the legal consequences of prior conduct." *Id.* The first category is described as a situation

"[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision [in a case involving pre-enactment conduct] is not retroactive." [*Landgraf, supra,* 511 U.S. at ——, 114 S.Ct.] at 1501. As an example, the Court cited a provision of the Clayton Act which altered the standard for evaluating the propriety of injunctive relief against labor picketing.

■ Assuming *arguendo* that the Law had some retroactive application, we nevertheless conclude that it would not violate the takings clause of the fifth amendment. In *Cent. Fla. II,* the court stated, at 383–84, that "the

Supreme Court in discussing the principle of retroactivity and its constitutional limitations tends to give Congress broad latitude in applying statutes retroactively, requiring only a rational basis for the retroactive application. *See United States v. Carlton,* —— U.S. ——, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994)." Although *Carlton* did hold that retroactive application of a statute satisfied constitutional limitations as long as the legislation was justified by a rational legislative purpose, —— U.S. at ——, 114 S.Ct. at 2023, that case in fact dealt with the due process clause of the fifth amendment rather than the takings clause.

We have, however, found sufficient support in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), to conclude that the takings clause was not violated in the case before us. In *Connolly,* the Court stated, *id.* at 224–25, 106 S.Ct. at 1025, that

> we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied on ad hoc, factual inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have "particular significance:" (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment backed expectations"; and (3) "the character of the governmental action." . . .

As now interpreted by the Trustee, the Law only affects the payment of fees after its enactment. It therefore only affects the propriety of prospective relief and is not retroactive.

■ Although the court, in *Cent. Fla. I,* 194 B.R. at 283, found that the debtor's payment of unexpected post-confirmation fees effected a "manifest injustice to the Debtor and its creditors," we cannot make any such finding on the basis of the instant record. The accumulated additional fee in issue is apparently about $3,750 to date, payment of which will apparently cause but a small reduction to the anticipated distributions. The "economic impact" and the "interference with financial expectations" of the parties are hence *de minimis.* It is noteworthy that, in *Cent. Fla. II,* the court, having acknowledged the Trustee's interpretation of the Law which would render the fees payable, did not reiterate these concerns.

■ The Debtors urge us to apply a tripartite test which they contend was established in *Loveladies, supra,* 28 F.3d at 1179, for determining whether a "takings clause" violation has occurred.[1] However, *Loveladies* was a case involving a denial of the plaintiff's permit to engage in construction on wetlands property owned by the plaintiff which would have reduced the value of the property from $2,658,000 to $12,500. 28 F.3d at 1173–75. The *Loveladies* court in fact acknowledged the general criteria referenced here at page 105, *supra,* as set forth in *Connolly, supra,* 28 F.3d at 1176, but articulated the tripartite test as a restatement of that test when property rights of the affected party were subject to drastic alteration by a regulatory taking, in light of the decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). This test applies, however, only where a property owner has first established that there has been a "regulatory taking of property . . . entitled to a monetary recovery for the value of the interest taken, . . ." *Id.* at 1179. There is no comparable effect on contractual or property rights here, which *Scheidemann,* citing *Landgraf,* indicated presented a distinct set of circumstances from those where a "regulatory taking" of property has occurred. The tripartite test is therefore inapplicable to the instant facts.

The character of the governmental action in issue here is almost identical to that at issue in *In re Prines,* 867 F.2d 478, 485 (8th

---

1. The elements of this test are as follows:
   (1) there was a denial of economically viable use of the property as a result of the regulatory imposition;
   (2) the property owner had distinct investment-backed expectations; and
   (3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine. *Id.*

Cir.1989), a case presenting facts far closer to those at issue here than *Loveladies*. *Prines* involved the application of the quarterly Trustee fees established under § 1930(a)(6) at their inception, as applied to a case filed prior to the effective date of the law instituting such fees. *Id.* at 480–81. The *Prines* court had little difficulty in overcoming a takings clause claim, likening the character of the measure to that of an increase in fees, taxes, or assessments during the course of a case, the applicability of which it indicated could not be questioned. *Id.* at 485.

■ Finally, we note a policy furthered by the enactment of the Law—*i.e.*, the expeditious completion of post-confirmation administration of Chapter 11 cases in order that they can be closed—would be frustrated as to pre-enactment cases like the instant ones if we accepted the Debtors' argument. The incidence of post-confirmation fees, when the administration of a case lags in its post-confirmation stages, is a powerful incentive for debtors to complete administration of cases in this court and then depart from our protective jurisdiction. Expedition of post-confirmation administration will benefit creditors anxiously awaiting full distribution in most cases. Imposition of what is effectively a modest user fee upon dilatory debtors is therefore quite easily justified.

This policy should be furthered with respect to cases filed and in which plans were confirmed before enactment of the Law, as well as those filed or confirmed thereafter. The instant cases are cases in point. We welcome laws which encourage Chapter 11 debtors to come to the court to effect their plans of reorganization, but litigate issues which arise post-confirmation in non-bankruptcy forums. At the hearing of June 5, 1996, the Debtors appeared far too anxious to litigate their post-confirmation differences with the Abington Club in this forum. An obligation to pay future quarterly Trustee fees will encourage them to take this and other post-confirmation disputes to what we believe are more appropriate forums.

## D. CONCLUSION

An order effecting the decision rendered in this Opinion will be entered.